**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| T.F., a minor, | : | |
| by his parents, | : | |
| D.F. and T.S.F., | : | |
| and on their own behalf, | : | |
| | : | |
| Plaintiffs, | : | C.A. No. |
| | : | |
| v. | : | |
| | : | |
| FOX CHAPEL AREA | : | |
| SCHOOL DISTRICT, | : | Jury Demand |
| | : | |
| Defendant. | : | |
| _____ | : | |

# COMPLAINT

**Preliminary Statement**

1. This cause of action is brought by T.F, a former Fox Chapel Area School District student and his parents alleging disability-based discrimination in violation of Section 504 of the Rehabilitation Act of 1973, Title 15 of the Pennsylvania Code and the Pennsylvania Human Relations Act.

2. Plaintiffs allege that Fox Chapel Area School District discriminated against T.F., a protected handicapped person with a life-threatening tree nut allergy, by:

   a. Failing to provide him with sufficient accommodations to address his disability when he attended the kindergarten;

    b. Failing to provide Plaintiffs with a Service Agreement that details the individualized accommodations, modifications and services necessary to ensure T.F. with access to his educational program;

    c. Isolating and segregating T.F. at a separate small desk to eat his lunch in the cafeteria, subjecting him to social isolation, ridicule and harassment;

    d. Failing to intervene with prompt, effective remedial action after becoming aware that T.F. was subjected to disability-based harassment from his peers who subjected him to social isolation, ridicule and harassment.

    e. Unnecessarily disclosing his medical condition to parents of other students within the District, subjecting him to further social isolation, ridicule and harassment;

    f. Contacting T.F.'s physicians and discussing confidential information without legal authorization;

    g. Retaliating against Plaintiffs by subjecting them to multiple truancy proceedings after he withdrew from school due to the District's failure to provide reasonable accommodations to his disability;

3. Plaintiffs assert that the above conduct also violates the anti-discriminatory provisions of the Pennsylvania Human Relations Act, 43 Pa.C.S. § 951-963.

4. Plaintiffs request declaratory, injunctive and equitable relief, as well as compensatory damages, to remedy Fox Chapel Area School District's discrimination.

**Parties**

5. Plaintiff, T.F. was a former student in the Fox Chapel Area School District. T.F. also has a severe tree nut allergy that can cause anaphylaxis and death. At all relevant times, T.F. was recognized as a protected handicapped student under Section 504 of the Rehabilitation Act of 1973 who was qualified to participate in school activities and receive educational instruction from the District.

6. Plaintiffs, D.F. and T.S.F., are the parents and natural guardians of T.F. who reside within Fox Chapel Area School District's boundaries. T.F., D.F. and T.S.F. are hereinafter collectively referred to as "Plaintiffs."

7. Defendant, Fox Chapel Area School District, is a municipal corporation within the Commonwealth of Pennsylvania with a principal place of business at 611 Field House Road, Pittsburgh, PA, 15238.

**Jurisdiction**

8. This Court has jurisdiction under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C.A. § 794a; under 28 U.S.C. § 1331, in that claims are asserted under the laws of the United States; and under 28 U.S.C. § 1343(a)(4), in that claims are asserted under laws providing for the protection of civil rights.

9. This Court has supplemental jurisdiction over claims made under the Pennsylvania Human Relations Act, 43 Pa.C.S. § 951-963, under 28 U.S.C. § 1367.

10. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1)-(2) because the events and omissions giving rise to the claims in this case arose in this judicial district and all the parties reside in this district.

**Procedural History**

11. On February 2, 2011, Plaintiffs filed a timely request for an administrative Due Process Hearing with the Office for Dispute Resolution seeking declaratory relief, tuition reimbursement, transportation, and compensatory education.

12. The Due Process Hearing convened on April 16, June 8, June 14, and June 19. By a final Order date August 14, 2012, the Hearing Officer found that Defendants had retaliated against Plaintiffs through unwarranted criminal truancy proceedings, but denied Plaintiffs' other claims.

13. On July 14, 2011, the Pennsylvania Human Relations Commission filed an Complaint alleging discrimination based upon the claims listed above. The Commission has not resolved its Complaint as of the date of filing this action.

14. Plaintiffs therefore bring this action requesting review and reversal of the Hearing Officer's decision and as an original action under 29 U.S.C.A. § 794a and 43 Pa.C.S. § 951-963.

**Factual Allegations**

15. T.F. has resided in the Fox Chapel Area School District (District), a recipient of Federal financial assistance, since January 2010.

16. T.F. has a history of anaphylaxis due to a severe allergy to tree nuts, and is at high risk for further life-threatening reactions if he is exposed to tree nuts again. Anaphylaxis is a severe type of allergic reaction that involves multiple body systems; it can cause mouth and throat swelling, interfere with breathing, produce shock and loss of consciousness. T.F. cannot eat foods containing tree nuts, including foods at risk for cross-contamination from tree nuts, as even trace amounts can be enough to cause a severe reaction. T.F. also suffers from asthma, which puts him at even a higher risk for a severe reaction should he ingest any allergens.

17. T.S.F. intended to enroll T.F. in Fairview Elementary School, a school within the District, beginning in fall 2010. T.S.F. attended parent orientation during spring 2010 and during that time she spoke with the school's principal and informed her of T.F.'s medical condition. She explained to the building principal about a recent incident during which T.F. experienced a near-fatal allergic reaction after eating a cookie that contained allergens.

18. During these conversations, the issue of whether a 504 plan was needed arose, and T.S.F. was assured that T.F. did not need a 504 plan because of policies already in place. In addition T.S.F. was informed that there was a "nut free

table" in the cafeteria. Based on these assurances, T.S.F. enrolled T.F. in Fairview.

19. After enrolling T.F., T.S.F. began to follow up on the representations made by the principal. In particular, she contacted the District staff responsible for the cafeteria food at Fairview, who stated he had no information regarding the ingredients of the food served in the cafeteria and stated that he had not dealt with a student allergy issue in years. T.S.F. also learned that there was no nut free table at Fairview.

20. Unable to secure reasonable assurances that T.F. would be safe at Fairview, on May 26th, T.S.F. requested a meeting to establish a 504 plan for T.F.

21. The Pennsylvania Code explicitly provides that all "related aids, services or accommodations" shall be included in a protected handicapped student's 504 plan (or "Service Agreement") and that "[o]ral agreements may not be relied upon." 15 Pa. Code § 15.7.

22. At the June 7th meeting, the District proposed a 504 plan only containing the following accommodations for T.F.:

    a) T.F. would not be given any food while in the District's care unless provided by T.F.'s parents.
    b) The District would provide an emergency care plan to teachers, cafeteria staff, and custodial staff.
    c) A nurse or parent designee would go on T.F.'s field trips.

23. The proposed 504 plan, and subsequent revisions, did not include any information regarding staff training about avoiding allergen exposure, the identification of anaphylaxis symptoms, treatment for anaphylaxis, or the location of the medication needed to treat anaphylaxis, epinephrine, within the classroom or on the school bus. The plan also failed to include designation of individuals responsible for treating anaphylaxis should an allergic reaction occur, as well as backups should the primary designee be unavailable, provision of a communication plan, training for food service personnel, hand washing requirements, and provision of tree-nut free lesson plans.

24. T.S.F. was not confident that the accommodations set forth in the first 504 plan were sufficient to safeguard T.F. against coming into contact with tree nut allergens, nor was she confident that prompt and competent medical treatment could be provided in the case of an emergency because the plan was insufficiently detailed about safety issues.

25. In light of the District's insufficient 504 plan, T.S.F. then developed a proposed 504 plan that contained information she had gleaned from her own research and T.F.'s physician's recommendations. The substance of the document was only five pages in length, followed by a signature page and several pages of general information appended to the end.

26. T.S.F. proposed that the District consider this plan at the next 504 meeting, which took place on August 24th, the day before school started. T.S.F. testified

that the meeting's attendees refused to review the document she had prepared and that they viewed it as ridiculous and "too long." The Coordinator of Special Education later testified that including the accommodations requested by T.S.F. in her proposed 504 plan "would make it impossible for people to know what to do in an emergency because there would be too much to read."

27. The Coordinator of Special Education stated three reasons why the District did not incorporate the accommodations requested by T.S.F. into T.F.'s 504 plan: 1) They were already addressed by routine practice, i.e., "part of the routine things that happen in the building at Fairview;" 2) The 504 plan only addressed issues that were done differently for T.F. than for other students covered by the District's Food Allergies Policy; and 3) She wanted the 504 plan to be understandable and not too long. The Coordinator of Special Education later testified that the incorporation of a five-page 504 plan in and of itself would have confused the reader.

28. The policy to which the Coordinator of Special Education was referring in the second reason was a Food Allergies Policy adopted by the District just a few months earlier, on May 10, 2010. The Coordinator of Special Education testified that she did not recall anyone at the meeting providing or explaining the Food Allergies Policy to Plaintiffs. The District's Food Allergies Policy was not only undisclosed to T.S.F. while she was determining whether it was safe to send T.F. to Fairview, it was also not disclosed to the undersigned counsel until April 16, 2012, the first day of the administrative hearing. Beyond

school personnel's statements regarding school policy, which varied greatly from individual to individual, Plaintiffs had no knowledge of what the District's policy actually required.

29. T.S.F. repeatedly requested documentation that would show the District's policies and procedures, yet the District never provided them. T.S.F.'s testimony is supported by the email she sent on October 12th, over four months after the initial 504 meeting. In this email, she stated, that the head nurse "was supposed to show us where those policies were in writing to ensure that they were in fact policy so that we could refer to them in the 504 plan to simplify it and scale it down in size." Despite these repeated requests that the District provide T.S.F. with its Food Allergies Policy, the District failed to provide it, even after T.S.F. requested the written policies in the October 12th email.

30. Despite the fact that T.S.F. had all along been requesting the "policy" in writing, the Coordinator of Special Education was inexplicably under the notion that all they were requesting was practices or procedure. She testified that she "never understood [T.S.F.'s request] to be a request for a school board policy."

31. The Coordinator of Special Education further testified that the "focus" of the 504 meetings with T.S.F. was not to provide a detailed list of the what related aids, services or accommodations would be provided to T.F., but "to explain how we did those things, not about where they were documented, but how we had done each of those items." This practice contradicted the explicit

requirements of 15 Pa. Code § 15.7 who requires aides, services and accommodations to be in writing and part of the 504 plan or Service Agreement.

32. As a result of the District's failure to adequately communicate its policy, procedures and practice, T.S.F. asked for documentation in the email discussed above and in two other emails written to the Coordinator of Special Education on October 6th and 11th.

33. In the first email, T.S.F. wrote "I am rewriting the 504 plan I presented to help narrow it down as you requested in our meeting. Please let me know what (by item number) is considered every day procedure and what you are considering unreasonable accommodations. My understanding of our informal conference is the district does not want to sign off on the 504 accommodations I have written (attached for reference) because they are unwritten procedures that you already do and do not feel they need to be replaced in a separate 504 plan."

34. In the second email, T.S.F. wrote "You have all stated that that you do not want policy that you already follow in the 504 plan. Is that the whole disagreement as well as the length of the plan? In order to prioritize my 504 plan requests, I need to know which ones you are saying are policy. Please let me know which ones are already policy so that I can modify and prioritize the remaining accommodations before the meeting. This should help us to have a productive meeting while only focusing on the accommodations that are not already policy. It doesn't make sense for me to prioritize what you are saying you already do as

standard policy. Once I can remove the policy from the document, we can focus only on the remaining accommodation requests."

35. The Coordinator of Special Education testified that she did not respond to the requests in either of these emails.

36. T.S.F. testified that while the negotiations regarding the 504 plan unfolded, she was deeply concerned that T.F. was being exposed to tree nut allergens at Fairview. There were three incidents that occurred between September 30th and October 7th that caused her to be concerned. Two of these incidents involved T.F. visiting the nurse for hives and one incident involved an itchy lip and facial swelling.

37. T.S.F. testified that this made her feel that T.F. "was not safe, that every time the phone rang, that I got a call from the nurse he was in there, I thought they were calling me to tell me he was dead."

38. Another one of the concerns voiced by T.F.'s parents was the seating arrangement at lunch. T.S.F. testified that the seating arrangement was unsatisfactory because T.F. was seated at a desk next to a round table where he was "probably three feet from the table, and then [there were] two seats in front of him nobody sat in." This left T.F. feeling humiliated to the point that he didn't want to eat anymore.

39. T.S.F. requested that T.F. be seated at a tree nut free table with his peers. This request, via email, was accompanied by a letter from T.F.'s treating physician requesting the same. T.S.F. requested other alternatives be explored, including having T.F. be seated at the end cap of this rectangular table with a buffer of two feet from his fellow students seated at the same table. The Coordinator of Special Education testified that the District did not provide this accommodation because she believed that the current seating arrangement, wherein T.F. sat alone at his desk, was "an appropriate seating arrangement."

40. T.S.F. also testified that this seating arrangement also led to T.F. being teased and other children making fun of him. She informed the District that the situation was causing T.F. to have nightmares and suffer from anxiety.

41. The harassment was further exacerbated by the District's previous public disclosure of T.F.'s medical condition. T.S.F. testified that there was a PTA meeting the first week of school where the building principal identified T.F. as a child with severe food allergies.

42. On September 22, T.S.F. wrote to the building principal reporting that her son was being teased by peers about having to sit by himself in the lunch room. T.F.'s teacher confirmed that that this teasing did in fact occur.

43. In an email from T.S.F. to the building principal, dated November 12, T.S.F. reported another incident involving T.F. being the target of teasing and bullying. Despite the fact that there had already been one confirmed incident of T.F.

being teased because of his disability, the building principal stated that she did not treat the second report as a "significant problem."

44. In the event of a complaint, the District's policy on nondiscrimination in the classroom requires the building principal to "prepare a written report within fifteen (15) days … [that] shall include a summary of the investigation, a determination of whether the complaint has been substantiated as factual and whether it is a violation of this policy, and a recommended disposition of the complaint." The building principal testified that she did not complete any of the items listed above. She later testified that she should "have conducted a formal investigation and provided a written document."

45. During the school year, the District impermissibly contacted T.F.'s physician despite the fact that T.S.F. neither signed a release permitting the District to share T.F.'s medical information with his physician, nor did she sign a release permitting T.F.'s physician to share medical information with the District. The lead school nurse testified that under the law, by virtue of the simple fact that she was a treating nurse, she was permitted to speak to T.F.'s physician regarding his private medical records.

46. In October, T.F.'s class had a Halloween party. T.S.F. testified that at one point T.F. was exposed to allergens when he started bobbing for apples. This led to T.F. vomiting and grabbing his throat. Fortunately, T.F. had a doctor appointment scheduled for immediately after the party and when he suffered

this reaction, he was already at the hospital and an emergency team treated him successfully.

47. Ultimately, T.S.F. concluded that the District's accommodations were inadequate. T.S.F. informed the building principal on November 12, 2010 that she would was withdrawing T.F. from Fairview. Again, T.S.F. conveyed to the building principal complaints of bullying by students at Fairview. In the second week of November, she withdrew T.F. from Fox Chapel Area School District.

48. Two weeks later, T.S.F. enrolled T.F. in Pennsylvania Cyber Charter School. The District received a request for records from the school on December 3rd and the District sent the records to the school on December 13th.

49. The building principal responded in a letter that T.F.'s failure to attend classes would be considered unexcused, and therefore, the District may file a citation with the District Magistrate's office. The District filed a citation for truancy on November 18th less than a week after the District had been informed that T.S.F. was withdrawing T.F. from Fairview. After T.F.'s withdrawal, the District scheduled approximately five truancy hearings before the District Magistrate, and each one was continued until a later date. Ultimately, the District did not pursue the truancy citation and in April 2011, it withdrew the citation for truancy. The District could not provide a satisfactory excuse for why it filed the citation and continued the matter numerous times.

50. The following school year, Plaintiffs enrolled T.F. in a private school that provided documented and detailed accommodations, services and modifications for their son to address his disability.

**COUNT I:  Violations of the Section 504 of the Rehabilation Act of 1973 and Chapter 15 of the Pennsylvania Code**

51. Plaintiffs allege that Defendant violated Section 504 and Chapter 15 of the Pennsylvania Code with deliberate indifference by providing T.F. with an insufficient Service Agreement that failed to provide for 1) training for school staff in the identification of anaphylaxis symptoms, 2) training for school staff in treatment of anaphylaxis, 3) designation of individuals responsible for treating anaphylaxis should an allergic reaction occur, as well as backups should the primary designee be unavailable 4) provision of a communication plan and designation of appropriate individuals and backups to contact emergency services 5) training for food service personnel, 6) provision of epinephrine, the drug used to treat anaphylaxis, in easily accessible locations throughout the school 6) provision of hand washing requirements for staff and students, 7) provision of tree-nut free lesson plans, and 8) implementation of this plan while using school transportation.

52. Plaintiffs allege that the District discriminated against T.F. with deliberate indifference by failing to provide him with a written service agreement that contained the related aids, services or accommodations should be provided to him by the District contrary to the explicit provisions of 22 Pa Code § 15.7, and

by failing to provide them with the District's Food Allergen Policy upon their repeated requests.

53. Plaintiffs allege that the District discriminated against T.F. with deliberate indifference by providing him a separate small desk to eat his lunch in the cafeteria, subjecting him to social isolation, ridicule and harassment, where other non-handicapped students were not similarly segregated from their peers.

54. Plaintiffs allege that the District discriminated against T.F. with deliberate indifference by unnecessary disclosing his medical condition to parents of other students within the District, subjecting him to further social isolation, ridicule and harassment, where non-handicapped students' medical histories were not similarly publicly disclosed.

55. Plaintiffs allege that the District discriminated against T.F. with deliberate indifference by contacting T.F.'s allergist and discussing confidential information without receiving permission from T.F.'s parents, where non-handicapped student's physicians were not similarly contacted.

56. Plaintiffs allege that District discriminated against T.F. with deliberate indifference by subjecting him to multiple truancy proceedings after he withdrew from school due to the District's failure to provide reasonable accommodations to his disability, which other non-disabled students did not encounter after withdrawal from school.

57. Plaintiffs allege that the District discriminated against T.F. with deliberate indifference by failing to intervene with prompt, effective remedial action after becoming aware that T.F. was subjected to disability-based harassment from his peers who subjected him to social isolation, ridicule and harassment.

58. Plaintiffs allege that the District denied T.F. a free and appropriate public education under Section 504 by failing to provide him with an education that meets his individual needs as a handicapped person as adequately as the education provided to non-handicapped students within the District.

59. Plaintiffs also allege that the District retaliated against them in response to their ongoing advocacy for accommodations and inclusion of their son. Specifically, parents allege that the District retaliated against them by subjecting them to criminal proceedings regarding T.F.'s's truancy after his withdrawal from school, by misleading them about their right to a written Service Agreement and by engaging in the above enumerated discriminatory actions.

**COUNT II: Violation of Pennsylvania Human Relations Act**

60. Plaintiffs hereby incorporate the allegations of the foregoing paragraphs into Count II.

61. Plaintiffs allege that Defendants violated the Pennsylvania Human Relations Act, 43 Pa.C.S. § 951-963, by and through the conduct alleged in paragraphs 51 through 59.

WHEREFORE, Plaintiffs pray this Court for an ORDER:

1. Assuming jurisdiction of this case;

2. Reversing the decision of the Hearing Officer;

3. Declaring that the District violated Section 504 of the Rehabilitation Act with deliberate indifference to T.F.'s needs as a protected handicapped person;

4. Finding that the District discriminated against T.F. on the basis of his disability in violation of the Pennsylvania Human Relations Act;

5. Finding that the District retaliated against parents in violation of Section 504 of the Rehabilitation Act;

6. Provide tuition reimbursement and transportation services for T.F. under 34 CFR 104.33(4);

7. Provide compensatory education funds for the period from August 25, 2010 through December 3, 2010;

8. Reimburse parents for tutoring and educational expenses;

9. Awarding compensatory and other damages;

10. Granting such other and further relief as may be appropriate.

Respectfully Submitted,

/s Jeffrey J Ruder
Jeffrey J. Ruder
Attorney I.D. No. 79270
429 Forbes Avenue, Suite 450
Pittsburgh, Pennsylvania 15219
Telephone: (412) 281-4959
Fax: (412) 291-1389
Email: jeffruder@gmail.com

Attorney for Plaintiffs

Date:  November 11, 2012