IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


T. F. *a minor by this parents* and D. F. and T.
S. F., *on their own behalf*,

                          12cv1666

       Plaintiffs,           **ELECTRONICALLY FILED**

       v.

FOX CHAPEL AREA SCHOOL DISTRICT,

       Defendant.


<u>**MEMORANDUM OPINION ON RE: PARTIES' CROSS-MOTIONS FOR SUMMARY
JUDGMENT (DOC. NOS. 28 AND 31)**</u>

## I.      Introduction

This is a civil rights action which centers on alleged disability based discrimination by

Fox Chapel Area School District against a former kindergartner with a severe tree nut allergy.

Plaintiffs, T.F. by and through his parents and on their own behalf, D.F. and T.F.R. (hereinafter

"Plaintiffs," "T.F." or "student") allege that Fox Chapel Area School District (hereinafter "Fox

Chapel," or "Defendant") failed to provide a Free Appropriate Public Education (FAPE) and

discriminated against them in violation of Section 504 of the Rehabilitation Act of 1973, Title 15

of the Pennsylvania Code, and the Pennsylvania Human Relations Act.  In Plaintiffs' Two Count

Complaint they contend that Defendant was "deliberately indifferent" to T.F.'s needs in the

following particulars: (1) Defendant failed to provide student with sufficient accommodation to

address his allegedly life-threatening tree nut allergy, (2) Defendant failed to provide a Service

Agreement,[1] that sufficiently detailed his individualized accommodations, (3) Defendant isolated and segregated against him at a separate small desk to eat his lunch in the cafeteria; (4) Defendant failed to intervene with prompt, effective remedial action after becoming aware that he was subjected to disability-based harassment; (5) Defendant unnecessarily disclosed his medical condition to parents of other students in Fox Chapel; (6) Defendant's nurse contacted his physicians and discussed confidential information with authorization to do so; and (7) Defendant retaliated against Plaintiffs by subjecting them to multiple truancy proceedings after student withdrew from school. Plaintiffs seek declaratory, injunctive and equitable relief as well as compensatory damages, including that Fox Chapel be required to pay tuition reimbursement for the full cost of attendance at The Shadyside Academy (based upon the alleged denial of a FAPE), the private school at which T.F. is currently enrolled as a second grader. Presently before this Court are Cross-Motions for Summary Judgment. Doc. Nos. 28 and 31. For the reasons that follow, this Court will GRANT Defendant's Motion for Summary Judgment (doc. no. 28) and DENY Plaintiffs' Motion for Summary Judgment (doc. no. 31).

## II.     Statement of Facts

The factual history of this case may be fairly summarized as follows. T.F. is an eight year old student who resides in Fox Chapel, and attended kindergarten from August, 2010, until December, 2010 at Fairview Elementary in the Fox Chapel School District. T.F. has a history of anaphylaxis due to a severe allergy to tree nuts, and is at "high risk for further life-threatening reactions," if he is again exposed to tree nuts. T.F. cannot eats foods containing tree nuts, including foods at risk for cross-contamination from tree nuts, "as even trace amount can be enough to cause a severe reaction." At all times relevant, he was recognized as a protected

---

[1] A service agreement is essentially a document that outlines what services or accommodations a child with a disability will receive. Doc. No. 1 at p. 2.

disabled student with a tree nut allergy under Section 504 of the Rehabilitation Act of 1973.

T.F. also suffers from asthma, which also puts him at a higher risk for a severe reaction should

he ingest any allergens.  Doc. No. 46 at Plaintiff's Statement of Facts, p. 23 at ¶ 1 and 2.

Fox Chapel had adopted a Food Allergies policy on May 10, 2010; however, the

District's Food Allergies Policy was not disclosed to either Plaintiffs, or their counsel, until the

first day of the administrative hearing in this case.  *Id*. at ¶ 16.   Unbeknownst to Plaintiffs, the

Head Nurse testified that she uses material from the Food Allergy Anaphylaxis Network

(FAAN) in training nurses and staff.  FAAN produces a binder with a DVD, an EpiPen and

trainer EpiPens.  According to the Head Nurse, Fox Chapel trained staff on its "guidelines" and

those guidelines were the FAAN guidelines.  However, the "guidelines" section of Fox Chapel's

Food Allergies Policy does not specifically mention the use of FAAN guidelines.

Upon expressing an interest in enrolling at Fox Chapel,[2] on May 26, 2010, T.S.F. (T.F.'s

mother) requested a meeting to establish a "504 Plan."  That meeting was scheduled for June 7,

2010, and took place on that date.  It was the first of several meetings between Defendant and

Plaintiffs.  Plaintiffs had provided a letter to Defendant prior to that meeting from T.F.'s

physician detailing the nature of his tree nut allergy.  At the meeting, at which Parents, the

Coordinator of Special Education, the Principal, the High School Nurse (responsible for training

on food allergies), the Guidance Counselor, and the Kindergarten Teacher were all present,

Plaintiffs were informed that indeed T.F. qualified for a 504 Plan.  *Id.* at p. 26, ¶ 10.

The medical information informed the meeting participants of T.F.'s allergies, the

necessity of an EpiPen, Jr., and an inhaler for T.F.'s use.  Although T.F.'s treating allergist, Dr.

MacGinnitie was not present at the initial 504 meeting, his original recommendation contained a

the above discrete list of accommodations.  At the meeting, Fox Chapel proposed the following

---

[2] T.F. formally enrolled at Fox Chapel in August of 2010.

accommodations in a written 504 plan, for T.F.:  (1) he would not be given any food while at Fox Chapel unless provided by his parents;  (2)  Fox Chapel would provide an emergency care plan to teachers, cafeteria staff, and custodial staff;  (3) a nurse or parent designee would go on T.F.'s field trips; and in case of medical emergency, Fox Chapel was to call, (a) 911; (b) Andrew J. MacGinnitie (T.F.'s physician), and (c) T.F.'s parents.  *Id.* at p. 25 at ¶ 9.

Plaintiffs did not, however, approve original Service Agreement because it was their view that there were unresolved issues that required further exploration with Dr. MacGinnitie, such as the use of hand sanitizers and seating arrangements in the cafeteria.  *Id*. at p. 7, at ¶ 30.

On August 20, 2010, Plaintiffs formally indicated their disapproval of the Service Agreement/504 Plan.  Fox Chapel received a letter from Dr. MacGinnitie, which recommended that T.F. sit at a nut-free table due to his allergies.  A second 504 meeting was held on August 24, 2010, at which T.S.F. made proposals to include in the 504 Plan, *id*. at p. 8, ¶¶ 31-33, including that T.F. not be required to sit alone at the cafeteria, and said document was approximately five (5) pages in length (the substance of it, with the overall packet being 19-pages long).  That proposal was rejected by Fox Chapel.

According to the administrative record, the Coordinator of Special Education testified that the accommodations requested by T.S.F. in its August 24, 2010 proposal would "make it impossible for people to know what to do in an emergency because there would be too much to read."  The Coordinator of Special Education stated three reasons why Fox Chapel did not incorporate the accommodations requested by T.S.F: (1) "part of the routine things that happen in the building at school;" (2) the 504 Plan only addressed issues that were done differently for T.F. than for other students covered by the District's Food Allergies Policy; and (3) she wanted the 504 Plan to be understandable and not too long.  *Id*. at p. 28 at ¶ 14.

On August 24, 2010, a second 504 Plan was proposed by Fox Chapel that contained two new accommodations. First, during lunchtime, T.F. would be seated at "tree nut free" table, which was, in fact, a student desk. Second, a treat box would be provided by Parents to T.F. on occasions such as classroom parties and birthdays. This Plan also changed the procedures in case of medical emergency by first requiring the responder to call the school nurse before calling 911. Also, on August 27, 2010, the principal sent a letter to the parents of classmates informing them that a classmate had a severe nut allergy, sharing information about allergies, requesting that the parents take certain step to reduce the risk of contamination in the class room, and the letter did not mention T.F. by name.

On August 31, 2010, a third 504 Plan was proposed by Fox Chapel which added three further accommodations. First, Fox Chapel would provide and T.F. would be permitted to purchase a tree nut free lunch, in a sealed wrapper, in the cafeteria as of September 13, 2010. Second, T.F.'s teacher would keep a tree nut-free snack to provide T.F. when other students were receiving snacks; this meant that Plaintiffs provided snacks to the entire kindergarten so that T.F. did not have to always sit at a separate desk. Third, it also included a directive to follow a food allergy plan, including the use of an EpiPen in case of severe reactions. *Id.* at p. 9, at ¶ 36. Plaintiffs, however, did not agree to this Service Agreement. A fourth meeting was scheduled for September 8, 2010. Over the ensuing weeks, the parties communicated regarding a Section 504 plan. No changes were made to the Service Agreement at the September 8, 2010 meeting.

In an email dated September 8, 2010, T.S.F. stated that "most if not all" of what T.S.F. had requested in her proposed 504 Plan came from the FAAN guidelines. She even offered to purchase the FAAN guidelines for Fox Chapel. Even though Head Nurse remembers this email and testified regarding it at the Due Process hearing, she did not recall responding to T.S.F. to

indicate that Fox Chapel in fact had the FAAN manual or that the District based its guidelines on it. Although, she testified that she brought the FAAN manual to the meetings with T.S.F., she did not recall ever providing or showing her the manual. Id. at p. 29, ¶ 19.

On September 15, 2010, the School Nurse contacted Dr. MacGinnitie and in an email from the School Nurse, she stated that "he agrees with our plan of care" for T.F. and he initialed it. *Id*. at ¶¶ 44-46; Doc. No. 39 at p. 23.[3]

On September 17, 2010, Plaintiffs contacted the Pennsylvania Department of Education, Special Education Advisor, Malcolm Connor and informed Dr. Conner that their son had a severe tree nut allergy and that no service agreement had been developed by Fox Chapel, and that they were fearful that T.F. would come into contact with tree nuts. *Id*. at p. 12-13, at ¶¶ 49-50. Dr. Carey, Director of Special Education responded to Dr. Conner that the 504 team had met on June 7, August 24 and 31, and September, 8, 2010. Dr. Carey informed Dr. Connor that Fox Chapel had developed an appropriate program and provided Plaintiffs with procedural safeguards to advise them of their rights to challenge the program. Dr. Connor responded to Plaintiffs and stated that the 504 team had met, and he explained that due process proceedings were available to resolve the dispute. *Id*. at ¶¶ 52-53.

Plaintiffs claim that T.F. was teased and bullied, that he experienced anxiety as a result of the seating arrangement, and on September 22, 2010, T.S.F. wrote an email to T.F.'s teacher stating that that another child with round glasses teased him for his placement at the stand alone desk. The boy admitted to the teacher that he, in fact, did tease T.F. *Id*. at ¶ 36. The parties agree that the teacher handled the discipline of the other student, but disagree that the issue was resolved and it did not occur again. *Id.* at p. 15 at ¶ 64. However, Fox Chapel "collected data"

---

[3] Dr. MacGinnitie agreed with the September 8, 2010 504 Plan. On each letter or prescription from Dr. MacGinnitie he offered for the school to contact him with any questions or concerns.

to address Plaintiffs concerns of isolation in the cafeteria and according to Fox Chapel, the "data" revealed that T.F. engaged with student's throughout his lunch period and "was having no problems at school." *Id.* at ¶¶ 68-69. Plaintiffs dispute this contention and state that this statement relates only to the quantity of interactions, but provides no indication as to the "quality or content of the interactions, and consequently fails to address reports of harassment, teasing and bullying." *Id.*

T.F.'s treating physician then requested that he be seated at a rectangular table, on the end cap with a two foot buffer from his fellow students seated at the same table, and that the others at the table also maintain a nut-free lunch. *Id*. at ¶ 34. Coordinator of Special Education testified that Fox Chapel however denied that accommodation, because she believed that the current seating arrangement was an appropriate one, and the Principal and Head Nurse indicated that "lunch tables are ROUND" and the "rectangular tables . . . are 'activity' folding tables" that would "look VERY different from the rest of the tables," for which they did not have appropriate chairs." *Id*. at ¶ 34. Plaintiffs contend that another parent agreed to provide a nut-free lunch for her child so that T.F. would not be alone; however, Defendant counters that there is no information in the record regarding this request.

Between September 30, 2010 and October 7, 2010, T.S.F. testified that she was concerned that T.F. was being exposed to tree nut allergens at Fox Chapel. Medical records reflect that T.F. sought medical treatment on September 30, 2010 for hives. Also, medical records show that T.F. also sought treatment for a bilateral ear infection from October 5-7, 2010, and had some type of allergic reaction which the parties dispute whether it was due to Motrin and Advil given to him at home by parents, or whether it was due to exposure to tree nut allergens.

In two emails to the Coordinator of Special Education on October 6, 2010 and October 11, 2010, T.S.F. asked for documentation regarding the Food Allergy Policy, and the Coordinator of Special Education testified that she did not respond to the requests in either of these emails. According to her testimony at the administrative hearing, she did not respond to the request in the first email because she believed the matter could be discussed again at the ensuing meeting, and she did not respond to the request in the second email because she felt it had been addressed at prior meetings.

In an October 12, 2010 email, T.S.F. stated "Head Nurse was supposed to show us where those policies were in writing to ensure that they were in fact policy so that we could refer to them in the 504 Plan to simplify it and scale it down in size." However, neither Head Nurse nor Coordinator of Special Education sent them. *Id*. at ¶ 20. Coordinator of Special Education, when questioned at the administrative hearing, stated, "I did not provide them any documents because I interpreted their requests to cover procedures that were in place in the building." When queried regarding whether she thought T.F.'s parents misunderstood the difference between policy and procedure, she answered in the affirmative, and went on to explain "Policy refers to school board policy; Procedures may be, and are most often, written procedures that are at either departmental levels or building levels; and Practices . . . can be procedures or they can be what we routinely do." *Id*. at ¶ 21. At the Due Process hearing, Dr. Carey, the Special Education Coordinator, testified that "the focus of the [504] meeting was going item through item with [T.S.F.] to explain how we did those things, not about where they were documented, but how we had done each of those items." *Id*. at ¶ 23.

On October 13, 2010, a fourth 504 Plan was proposed that included an additional accommodation requiring that T.F.'s cafeteria table (separate student desk) be cleaned with a cleaner that removes food allergens. *Id*. at p. 26 at ¶ 10.

Also, in October, 2010, T.F.'s class had a Halloween party. T.S.F. testified that although many of the mothers involved agreed not to bring in any food aside from apples and water, there were mothers bringing in food throughout the parties, and according to Plaintiffs following T.F. bobbing for apples, he suffered a "reaction" (he was grabbing his throat as if it was closing up) and was treated successfully at a hospital following this "medical emergency," since he was already scheduled to be there for a doctor's appointment. Defendant denies that the medical records support this "medical emergency" occurred, and cite the expert opinion of school district expert, Dr. Eigen.

On October 18, 2010, T.S.F. filed a Due Process Complaint notice on behalf of T.F. *Id*. at p. 3, ¶ 9. In an email to Principal, dated November 12, 2010, T.S.F. reported that T.F. was the target of bulling and teasing. Principal, however, testified at the administrative hearing that she did not treat the second report as a "significant problem," because T.S.F. was unable to provide the principal with situations, examples, or names of students who were bullying T.F. *Id.* at ¶ 36.

Fox Chapel policy requests the principal to prepare a written report within 15 days of a complaint, including a summary of the investigation, a determination of whether the complaint was substantiated, whether it is a violation of a non-discrimination policy, and a recommended disposition. *Id*. at ¶ 38. The Principal, however, admitted that she did not complete a written report, because she did not believe there was either a verbal or written complaint of harassment and she testified that she believed Plaintiffs' complaint to be "ill-founded." *Id.*

In a November 12, 2010 phone call between the Principal and T.S.F., T.S.F. informed the Principal that she would be withdrawing T.F. from school. Also, during that conversation, the prior allegations of bullying and teasing were discussed, although no specifics were given, including names, situations, or examples. On November 15, 2013, the Principal sent a letter to Plaintiffs indicating that excessive absences could lead to truancy proceedings, as well as informing Plaintiffs of their right to file a complaint regarding the allegations of bullying. Plaintiffs, however, filed no such formal complaint of bullying. Doc. No. 46 at p. 18, ¶¶ 74-76.

As of November 15, 2010, T.F. ceased to attend school (having already been absent for 11 days), and he was formally withdrawn from Fox Chapel on December 3, 2010. Fox Chapel filed a citation for truancy on November 18, 2010, less than a week after Fox Chapel had been informed that T.F. was being withdrawn from school.

After T.F.'s withdrawal, and Fox Chapel's report of truancy, the District Magistrate, Elissa M. Lang, scheduled approximately five (5) hearings, beginning on December 7, 2010, all of which were continued. Ultimately, Fox Chapel did not pursue the truancy citation, and in April, 2011, it withdrew the citation for truancy. T.S.F. testified that each hearing was continued, and according to her affidavit, she was required to find a babysitter and take off of work, only to drive to the hearing and find out it was continued. *Id.* at p. 43 at ¶¶ 48-49.

Plaintiffs' counsel entered his appearance on December 8, 2010, and requested a continuance for the hearing scheduled on the Due Process Complaint scheduled for December 17, 2010. The Due Process hearing was rescheduled for December 29, 2010, and another request for continuance was filed and Fox Chapel did not oppose the request. A new hearing was set for February 1, 2011; however, Plaintiffs' counsel was unavailable. Plaintiffs' attorney withdrew the Due Process Complaint, stating "the parents have decided to not pursue litigation at this

time." *Id*. at p. 4, ¶14.  On December 3, 20101, T.F. was officially enrolled in a cyber-charter school for the remainder of the 2010-2011 school year.  *Id.* at p. 20 at ¶ 85.  He has since been enrolled as a student at The Shadyside Academy, and he is now in the second grade.  *Id*. at p. 22, at ¶¶ 96-97.

On February 1, 2012, Plaintiffs, with the assistance of counsel again filed a Due Process Complaint.  The Due Process hearing was held in four sessions, and the Special Education Hearing Officer denied all of Plaintiffs' claims regarding Fox Chapel's provision of a free appropriate public education ("FAPE") to T.F.   The Hearing Officer found Fox Chapel to have met all obligations in the provision of FAPE to T.F. under Section 504.  The Hearing Officer, however, determined that Fox Chapel retaliated against Plaintiffs in maintaining truancy proceedings after January of 2011 and through April of 2011.

On November 11, 2012, Plaintiffs filed the above-captioned civil action seeking reversal of the Hearing Officer's decision and as an original action under 29 U.S.C. § 794a and 43 Pa. C.S. § 951-963.  Fox Chapel filed a counterclaim in the nature of an appeal from the portion of the final administrative decision of the Hearing Officer wherein he found that Fox Chapel retaliated against Plaintiffs for engaging in Section 504 processes.

**Additional Due Process Hearing Testimony**

T.S.F. testified that Fox Chapel impermissibly disclosed T.F.'s disability.  First, there was a PTA meeting the first day of school where Principal announce T.F.'s allergies and asked T.S.F. directly if she would discuss them at the meeting, which concerned T.S.F. because all of the parents knew that if there were any food restrictions that "T.F. was to blame for it."  *Id.* at ¶ 40.  Second, Plaintiffs contend that the kindergarten teacher identified T.S.F. as the parent of a student with food allergies at a parent orientation meeting.  Defendant denies this allegation.

T.S.F. testified that Fox Chapel impermissibly contacted T.F.'s physicians without them parents having signed a release to do so. Defendant agrees with Plaintiffs' contentions in this regard, but does not agree that the contact was impermissible. *Id*. at ¶ 42. Rather, they counter that on each of every letter or prescription from Dr. MacGinnitie's office to the school, it offered for the school to contact him with any questions or concern. Defendant also contends that a school nurse is permitted to contact a student's doctor to obtain clarity on the doctor's orders.

Another one of the concerns voiced by T.F.'s parents was the seating arrangement at lunch. Parents were concerned that T.F. would be, and was, socially isolated because he was forced to sit at a desk by himself. *Id.* at p. 36 at ¶ 32. T.S.F. testified that the seating arrangement was unsatisfactory because T.F. was seated at a desk next to a round table where he was "probably three feet from the table, and then [there were] two seats in front of him nobody sat in." *Id.*

Also, at the administrative hearing, Plaintiffs expert, Dr. Scott Sicherer, a physician in the Pediatrics Division of Allergy and Immunology at Mount Sinai Medical Center, New York, NY, provided expert testimony on behalf of Plaintiffs regarding Fox Chapel's policies and the specifics requested by T.S.F. in her proposed 504 Plan.

> It seemed to me, and sort of is obviously reflected in my six-page document, that it wasn't clear, at least to [T.S.F.], that many of the – some of the basic things and details were just not being addressed, and often a parent will ask for that – those issues to be put into the 504 so that it is clear that they are … being addressed specifically for that child, so there's specificity. So again, you can have many things written down that you say you are going to do, but are you actually doing them and, if you are doing them, is the person who's concerned about this, meaning the child and the family, do they understand that it is being followed and that there are actual implementations in place, and if there are nuances there that aren't meeting the needs of the specific child, are there reasonable ways of addressing those things. And, again, that's where you usually see additional specifics come into the 504 Plan. N.T. 263-64.

> [T]here could be a general plan, but there still could be issues if that plan is not being implemented, if it is not clear that it is being implemented. In medicine we call it "not documented, not done." I mean, if it is not clear that the stuff being said in whatever the plan is being done, that's where problems might arise.

*Id.* at p. 33-34 at *¶ 27.*

As Fox Chapel points out, Dr. Sicherer opined that if Fox Chapel's policy was implemented as a common practice that the policy requirements would not need to be rewritten into a student's 504 Plan. Dr. Sicherer submitted a report also discussing the issue of seating wherein he stated that this issue was not sufficiently addressed in the 504 Plan because it relegated T.F. to a separate table. The report further states, "While this might fulfill risk reduction, it is counter to social interactions and can promote isolation and anxiety. Schools usually address this more appropriately by having an allergy-aware table where friends can be invited to sit with the allergic child if their meal is "safe." T.S.F.'s description of the table suggests isolation rather than inclusion." P-28: 4. Although Teacher and Principal testified that they observed T.F. in the classroom and in the cafeteria and that he didn't display any emotional problems, they both testified that they did not know how T.F. demonstrated anxiety.

Fox Chapel's expert, Dr. Howard Eigen, a Board Certified Pediatric Pulmonologist opined to a reasonable degree of medical certainty that "Fox Chapel provided the student with appropriate reasonable accommodations to allow him to access his educational environment." Doc. No. 41 at p. 7.

One of the accommodations requested by T.S.F. was that substitutes be trained regarding T.F.'s food allergy. Head Nurse testified that she could not recall whether substitute teachers receive training that covers anaphylaxis and how to use the EpiPen. Although she recognized that substitute teachers need the same level of food allergy training as regular teachers, she could not answer whether there was a provision in the Food Allergies Policy that covered this issue,

and she could not reference a specific policy, procedure or practice that required the training of substitute teachers in the recognition or treatment of anaphylaxis. *Id.* at ¶ 28.

### III.    Standard of Review

Summary judgment may be granted if, drawing all inferences in favor of the non-moving party, "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).

A fact is "material" if proof of its existence or non-existence might affect the outcome of the suit under applicable law. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248, (1986). "Facts that could alter the outcome are material facts." *Charlton v. Paramus Bd. of Educ.*, 25 F.3d 194, 197 (3d Cir.1994). Disputes must be both (1) material, meaning concerning facts that will affect the outcome of the issue under substantive law, and (2) genuine, meaning the evidence must be such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248.

A party moving for summary judgment has the initial burden of supporting its assertion that fact(s) cannot be genuinely disputed by citing to particular parts of materials in the record – i.e., depositions, documents, affidavits, stipulations, or other materials – or by showing that: (1) the materials cited by the non-moving party do not establish the presence of a genuine dispute, or (2) that the non-moving party cannot produce admissible evidence to support its fact(s). Fed.R.Civ.P. 56(c)(1).

Conversely, in order to defeat a motion for summary judgment, the non-moving party must support its assertion that fact(s) are genuinely disputed by citing to particular parts of materials in the record, or by showing that: (1) the materials cited by the moving party do not

establish the absence of a genuine dispute, or (2) the moving party cannot produce admissible evidence to support its fact(s). *Id.*

In reviewing a motion for summary judgment, the Court "does not make credibility determinations and must view facts and inferences in the light most favorable to the party opposing the motion." *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1127 (3d Cir.1995).

### Review of Administrative Record

Where, as here, both parties appeal from a Due Process Hearing determination, the Court applies a standard of review which is different from that of the typical summary judgment proceedings. Once a party initiates an appeal from the administrative Due Process findings, the IDEA provides that the Court, "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the Court determines is appropriate." 20 U.S.C. § 1415(i)(2)(B).

Essentially, the above statutory language calls for a "modified version of *de novo* review," requiring this Court to "give due weight to the factual findings of the [hearing office]." *L.E. v. Ramsey Bd. of Educ.*, 435 F.3d 384, 389 (3d Cir. 2006)(internal citations omitted). Although the United States Court of Appeals for the Third Circuit has not yet determined the standard of review applicable to Section 504 claims,[4] two Pennsylvania District Courts have determined that it was not necessary to resolve the issue, because even under the "due weight" standard, the Court has discretion to defer or not defer to the administrative findings and would

---

[4] The United States Court of Appeals for the Third Circuit has observed that there appears to be "few differences, if any," between the requirements imposed under Section 504 and those provided under the IDEA. See *W.B. v. Matula*, 67 F.3d. 484, 492-93 (3d Cir. 1995).

have reached the same conclusion if it were to conduct a *de novo* review of the record. *Molly L. v. Lower Merion School District*, 194 F.Supp.2d 422, 429 (E.D. Pa. 2002); See also, *Centennial School District v. Phil L. ex rel. Matthew L.,* 799 F.Supp.2d 473, 482 (E.D. Pa. 2011). The parties disagree on which standard of review is applicable here. Plaintiffs seek a *de novo* review, which is the least deferential standard of review, on the basis that the Hearing Officer lacked authority to allow discovery and the language of Section 504 does not demand that a reviewing court give "due weight" to the administrative findings. Defendant seeks a modified version of *de novo* review. The Court will apply a *de novo* standard of review.

### IV. Discussion

### A. Fox Chapel did not discriminate against Plaintiffs, did not violate Section 504, and at all times provided T.F. with a FAPE.

Section 504 provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]" 29 U.S.C. § 794(a).

In order to assure that an eligible child receives a FAPE under Section 504, a student must be provided with "regular or special education and related aids and services that . . . are designed to meet individual educational needs of [disabled] persons as adequately as the needs of [non-disabled] persons are met" and also comply with procedural requirements related to least restrictive settings, evaluations, and access to procedural due process. 34 C.F.R. § 104.33(b). The Hearing Officer found that "the entirety of the record supports the finding that Fox Chapel was at all times ready to provide accommodations and appropriately did so." This Court agrees.

To prevail on a claim under Section 504 in a public school context, a plaintiff must show that he or she: "(1) has a disability; (2) was otherwise qualified to participate in a school

program; and (3) was denied the benefits of the program or was otherwise subject to discrimination because of [his or her] disability." *Chambers ex rel. Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 189 (3d Cir. 2009). The parties only dispute whether the third element is satisfied. *Id.* Doc. No. 32 at 8–11.

In claims for compensatory damages under Section 504 of the Rehabilitation Act, the standard of intentional discrimination was recently elucidated by the United States Court of Appeals for the Third Circuit, in *S.H. ex rel. Durrell v. Lower Merion School District,* 729 F.3d 248 (3d Cir. 2013), a case of first impression. As the Court of Appeals for the Third Circuit pronounced, where, as here, Plaintiffs seek compensatory damages under Section 504, they must show discrimination on the part of Defendant rising to a level of "deliberate indifference." *S.H. ex rel Durrell v.*, 729 F.3d 248 (3d Cir. 2013). In order to meet this standard, Plaintiffs must show that Fox Chapel: (1) knew that a federally protected right was substantially likely to be violated, and (2) failed to act despite that knowledge. *Id.* at 263 (citing *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001)). Plaintiffs are not required to show that Defendant had "personal ill will or animosity," but still must show that the discrimination resulted from a "deliberate choice, rather than negligence or bureaucratic inaction." *Id.* at 263 (internal citations omitted).

Against this backdrop, the Court views the allegations and contentions of Plaintiffs, who claims that Fox Chapel acted in violation of Section 504 and Chapter 15 of the Pennsylvania Administrative Code, and that T.F. was denied FAPE and otherwise discriminated against through the actions or inactions of Defendant, who were deliberately indifferent to Plaintiffs' rights.

Plaintiffs cite to several alleged failures of Defendant in support of their claims for deliberate indifference, namely: (1) failing to provide a Service Agreement to T.F. that included necessary accommodations and/or were inadequate, and vague; (2) failing to allow or significantly impeding parental participation in the decision-making process for creating a 504 Plan; (3) failing to change T.F.'s mealtime seating, placing him at a desk wherein T.F. felt isolated and anxious; (4) failing to address or subjecting T.F. to disability-based peer harassment and likewise, failing to intervene with prompt remedial action; (5) denying T.F. transportation to and from school without cost to parents; (6) unnecessarily disclosing T.F.'s medical condition to other parents and discuss the same with T.F.'s physicians without receiving permission from T.F.'s parents; and (7) instituting criminal truancy proceedings in response to their ongoing advocacy for accommodations. The Court notes that with the exception of the continuance of the truancy proceedings, the Hearing Officer found in favor of Fox Chapel and against Plaintiffs on each of Plaintiffs' claims.

The Court must determine if these contentions and factual allegations, accepted as true, would create "an inference that [Fox Chapel] acted with deliberate indifference toward [T.F.] because of his disability." *Chambers v. Sch. Dist. of Philadelphia Bd. of Educ.*, 827 F.Supp. 2d 409, 426 (E.D. Pa. 2011). Critically, as rehearsed, Plaintiffs must demonstrate that Fox Chapel's conduct was more than negligent and involved an element of deliberateness. *Chambers*, 827 F.Supp.2d at 426.

The material facts of this case do not demonstrate that Fox Chapel acted with deliberate indifference towards T.F. in any one, or all, of the above particulars. Actually, the facts demonstrate quite the opposite. When viewed in the light most favorable to the non-moving party, the facts evince that Fox Chapel was attempting to work with Plaintiffs for several months

even prior to the start of the school year, and had proposed approximately four (4) 504 Plans, all of which were rejected by Plaintiffs. Fox Chapel made numerous revisions to the proposed 504 Plans, after consulting with Plaintiffs and T.F.'s treating physician, and as the Hearing Officer stated; "the record taken as a whole supports the findings that throughout the period of May-December 2010, the District strenuously sought to meet its obligations to the student under Section 504." Doc. No. 32-1 at p. 10.

In the recent case of *Ridley School District v. M.R.*, 680 F.3d 260, 280 (3d Cir. 2012), cited by Defendant, the United States Court of Appeals for the Third Circuit specifically stated that "to offer an 'appropriate education' under the Rehabilitation Act, a school district must *reasonably* accommodate the needs of the handicapped child so as to ensure meaningful participation in educational activities and meaningful access to educational benefits." *Id*. at 280. (Emphasis added). Just as in the findings of the Court of Appeals in the case of the student in the *Ridley School District*, who also had severe allergies, Fox Chapel similarly took "reasonable steps to accommodate [T.F.'s] disabilities and include [him] in all class activities; it was not required to grant the specific accommodations requested by Parents or otherwise make substantial modifications to the programs that were used for all other students." *Id*. at 282 (other citations omitted).

While this Court is not unsympathetic to the fears and emotionality of Plaintiffs, and recognizes the serious nature of T.F.'s allergic reaction, the Court finds that the actions of Fox Chapel are nowhere close to establishing the level of required deliberate indifference in order to successfully sustain a claim under Section 504. On the contrary, the factual allegations support the conclusion that Fox Chapel was working diligently, although perhaps imperfectly, in attempting to accommodate T.F.'s disability. The sum total of all of Plaintiffs' factual

allegations, even when taken wholesale, evidence no more than arguably mere negligence on the part of Fox Chapel, and as Court of Appeals in *S.H. ex rel. Durrell* most recently illuminated, mere negligence is insufficient to make out a successful claim under Section 504 or its state counterparts. 729 F.3d 248, 263.

There has been no evidence to support an inference that the School District had any knowledge that T.F.'s federally protected rights were substantially likely to be violated and they failed to act. Although evidence arguably has been presented that Fox Chapel failed to respond to every one of Plaintiffs' concerns (with the placement of the desk at lunch), unlike *Chambers v. Sch. Dist. of Philadelphia Bd. of Educ.*, - - - Fed. Appx. - - - - 2013 WL 5225182, * 4-5 (3d Cir. Sept. 17, 2013), there is no evidence of "serious and repeated" failures on the School District's part. Simply put, there is no evidence that Defendant "intentionally refused to take any remedial or corrective action to remedy the problem." *Scaggs v. New York Dept. of Educ.*, 2007 WL 1456221, at * 16 (E.D.N.Y. 2007). Isolated mistakes and failures to respond promptly to parental concerns are not more than negligence. The evidence as a whole demonstrates that Fox Chapel considered Plaintiffs' concerns in formulating plans along with all of the professionals involved (T.F.'s physician, school nurse, guidance counselor, principal etc.).

With the exception of the lunch room desk situation, on which Plaintiffs appear to place great emphasis, and was an alleged reason for T.F.'s withdrawal from school, Fox Chapel endeavored to include nearly all of Plaintiffs' other substantive requests into the proposed 504 Plans. Fox Chapel chose to deny the request for specific accommodation on the placement of a different shaped table in the lunch room, for reasons which were, at most, not adequately explained, but this denial falls far short of establishing deliberate indifference to T.F.'s needs. Likewise, the denial of Plaintiffs' proposed 504 Plan which included, among other things, over 5

pages of substantive information, was denied by Fox Chapel, and its reason for doing so - - that persons who needed to read the Plan in an emergency would not be able to do so - - is a reasoned decision, and does not reveal any deliberate indifference to T.F.'s rights. After all, Section 504 does not mandate, "substantial changes to the school's program and courts 'should be mindful of the need to strike a balance between the rights of the student and [the] parents and the legitimate financial and administrative concerns of the school district.'" *Ridley School Dist.*, 680 F.3d at 281 (internal citations omitted).

As for Plaintiffs' allegations that T.F. experienced peer-to-peer harassment, in order to sustain a Section 504 claim, case law requires a showing that (1) the victim was harassed on the basis of [his] disability; (2) the alleged harassment was so severe, pervasive and objectively offensive that it altered the condition of [his] education; (3) the school district had actual notice about the disability-based harassment and (4) the school district was deliberately indifferent to the harassment. *K.M. v. Hyde Park. Cent. School District.*, 381 F.SUpp.2d 343 (S.D. N.Y. 2005). Again, the facts in this case demonstrate one specific incident wherein the "boy with the round glasses," admitted to making fun of T.F. for sitting at another table at lunch. This incident was promptly investigated and handled by the teacher, and no other concrete complaints were provided by Plaintiffs to the school.[5] The Court finds that any teasing T.F. experienced did not rise to the level of severe, pervasive or objectively offensive to the point that it altered the condition of his education; nor could Plaintiffs succeed in showing that Fox Chapel was deliberately indifferent to the alleged harassment.

Plaintiffs also attempt to argue (although such allegation was not included in their Complaint) that Defendant failed to provide free transportation to school. The facts of record do

---

[5] There is also some evidence of another altercation, but the notes stated that both T.F. and the other student hit one another.

not support this allegation.  T.S.F. testified at the Due Process Hearing that she contacted the bus company to learn how they handled food allergies and the response she received from the bus company was not, in her view, sufficient to ensure T.F.'s safety.  Doc. No. 46 p. 24 at ¶ 5. According to Dr. Carey, this issue was never fully discussed because T.S.F. informed the team at the first meeting that she would drive T.F. to school.  T.S.F. never requested transportation but if she had, Dr. Carey testified unequivocally that it would have been provided.  Ms. Cox's testimony is consistent with Dr. Carey.  She also testified that T.S.F. informed the team at the first meeting in June of 2010, that she would transport T.F.

Plaintiffs further posit that Defendant violated the Family Rights Education and Privacy Act (FERPA) when it made unauthorized communications of T.F.'s educational record.  As set forth in the factual history, Dr. MacGinnitie encouraged the school nurse to contact his office and the school nurse testified that she is permitted as a treating nurse to contact a student's doctor to get clarity on directions.  Pursuant to the Joint Guidance on the Application of FERPA and HIPAA To Student Health Records issued by the U.S. Department of Health and Human Services, and the U.S. Department of Education in November, 2008, the Joint Guidance provides:  The HIPAA Privacy Rule allows covered health care provider to disclose Protected Health Information about students to school nurses, physicians, or other health care providers for treatment purposes, without authorization.  See Doc. No. 36 at pgs. 42-44. ¶¶ 2 and 6. Accepting Plaintiffs' contentions as true, that Defendant impermissibly revealed private information under FERPA, the Court finds that said error, if any, constitutes nothing more than negligence.[6]

---

[6] Also, the United States Supreme Court has held that FERPA creates no personal rights of enforcement.  *Gonzaga Univ. v. Doe*, 536 U.S. 273 (2002).

In sum, this Court's role is not to determine whether Fox Chapel could have endeavored in some way to address Plaintiffs' concerns in a more orderly or reasoned way, but only to determine if Plaintiffs have presented sufficient evidence to demonstrate Fox Chapel's deliberate indifference. When the totality of Fox Chapel's conduct is reviewed, accepting the deficiencies alleged by Plaintiffs, Plaintiffs have failed to establish a violation of any federally protected right or that Fox Chapel exhibited any deliberate indifference towards them because of T.F.'s disability. Accordingly, upon a *de novo* review, and for the reasons set forth hereinabove, the Court also finds the Hearing Officer committed no err in his determinations in this regard.

### B. The Hearing Officer Erred as Matter of Law in Finding Fox Chapel Retaliated Against Plaintiffs

Although the Rehabilitation Act does not expressly include a cause of action for retaliation, the Act was amended in 1978 to incorporate the "remedies, procedures, and rights set forth in Title VI of the Civil Rights Act of 1964." *Weber v. Cranston School Committee*, 212 F.3d 41, 47-48 (1st Cir. 2000).

The elements of a retaliation claim under Section 504 are: "(i) a plaintiff was engaged in protected activity; (ii) the alleged retaliator knew the plaintiff was involved in protected activity; (iii) an adverse decision or course of action was taken against plaintiff; and (iv) a causal connection exists between the protected activity and the adverse action." *Weixel v. Board of Educ. of City of New York*, 287 F.3d 138, 148-49 (2d Cir. 2002); *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259 (3d Cir. 2007).

To establish the requisite causal connection, a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action; or (2) a pattern of antagonism coupled with timing to establish a causal link. See *Lauren W. ex rel. Jean W*, 480 F.3d 259, 267 (citing *Krouse v. American Sterilizer Co.*, 126

F.3d 494, 503–04 (3d Cir.1997)); *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920–21 (3d Cir.1997).

The parties agree that Plaintiffs were engaged in protected activity of advocating for T.F.'s rights to an appropriate Section 504 Plan, and that they ultimately withdrew him from Fox Chapel based upon their lack of agreement with the numerous Plans that were proposed by Fox Chapel. The course of action taken against Plaintiffs was the filing and maintenance of the truancy action after T.F. was enrolled at the cyber-charter school. Accordingly, in order to demonstrate a claim for retaliation, Plaintiffs must demonstrate a causal connection between their advocating for a Section 504 Plan and the filing (or continuation) of the truancy action.

The parties dispute what form of the causation standard is applicable to the instant dispute. While Defendant argues that the "but for" test (which is applicable for Title VII retaliation claims) is appropriate, *University of Texas Southern Medical Center v. Nassar*, ___U.S.___, 133 S.Ct. 2517, 2525 (June 24, 2013), Plaintiffs argue that causation is established where an adverse decision is based "in part" on knowledge of the protected activity. *Bisong v. U. of Houston*, 493 F.Supp. 2d 896, 911 (S.D. Tex. 2007).

In keeping with the *Lauren W. ex rel. Jean W.* decision, and the *University of Texas Southern Medical Center* decision (albeit applicable to Title VII retaliation claims), this Court will apply the but-for test of causation which is similar in kind to the applicable standard of tort law causation. Plaintiffs then must demonstrate that the desire to retaliate was the "but for" cause of the filing and continuation of the truancy proceedings. Additionally, under *Lauren W. ex rel Jean W.*, Plaintiffs could show an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action; or a pattern of antagonism coupled with timing, in order to establish a causal link.

The Hearing Officer found that the "use of truancy proceedings beginning in February 2011, and thereafter, the Fox Chapel Area School District engaged in retaliatory behavior against the Parents." Doc. No. 29, at p. 5, citing A. 307. What Plaintiffs however failed to establish at the Due Process Hearing, and continue to fail to show is a causal connection between any of the alleged protected activities and Defendant's requests to indefinitely continue the truancy proceedings. At most, there is temporal proximity between the original truancy filing and the Due Process claims of Plaintiffs, which would always exist in a truancy situation such as this, because the withdrawal from school and the truancy implications were directly tied to the 504 Plan, or lack thereof. The record, however, is devoid of any pattern of antagonism between the parties, only perhaps frustration and emotionality on the part of T.S.F. There is no evidence that Fox Chapel acted in an unprofessional or unsympathetic manner and there is no evidence of antagonism. The tone and substances of the many letters and emails on record actually reveal the opposite.

To recount, as the above factual history demonstrates, Plaintiffs ceased sending T.F. to school in November, 2010, and notified Fox Chapel via email on November 12, 2010 that T.F. was not returning to school based upon the lunchroom seating, as well as unspecified teasing and bullying. Dr. McNamara then notified T.S.F. of her right to file a formal complaint, but no complaint was ever filed. In a letter from Dr. McNamara to T.S.F., she notified T.S.F. that as the parent she was responsible for ensuring that T.F. attends school, and offered a meeting to rectify the situation. A-487. After T.F. had missed 11 unexcused days, Fox Chapel filed charges with Magistrate, Elissa M. Lang, on November 18, 2010. A-488. Fox Chapel contends and the Court agrees, that it is required by law, 24 P.S. § 13-1354, to file said charges when a child of compulsory school age stops attending school. These charges were filed weeks before T.F.

ultimately withdrew from Fox Chapel and weeks before he enrolled in a cyber-charter school. And, as Defendant emphasizes, the Hearing Officer held that the initial filing of the truancy petition was appropriate.

The original hearing was scheduled for December 7, 2010, only four days after T.F. officially withdrew from Fox Chapel. Fox Chapel asked the Magistrate to continue the hearing, because T.F. had at that point missed a month of school, and second, even if T.F. were enrolled in cyber-school, there is a legitimate dispute about whether it is home district's responsibility to ensure that the student complies with compulsory school attendance. 24 P.S. § 17-1701-A.

Contrary to the allegations of Plaintiffs, the Court does not agree that Fox Chapel "subject[ed] the family to multiple truancy proceedings." In fact, Fox Chapel requested that the Magistrate indefinitely continue the hearings. Whether the Magistrate notified Plaintiff or not, as Defendant emphasizes, Fox Chapel does not know, nor is it responsible for the Magistrate's scheduling actions. Dr. McCommon testified that no decision regarding whether to file charges, request continuances or withdraw charges was based upon T.F.'s disability, and that standard practices were followed for a child who stops attending school.

Plaintiffs have not produced evidence sufficient to establish a causal connection between the continuances that occurred, and both parties agreed would be indefinitely continued. A. 497-498. Furthermore, the "failure" of Fox Chapel to withdraw the petition until the end of the school year was not a retaliatory act. While the Hearing Officer found that it was, his opinion was based more upon speculation, rather than record evidence. The Hearing Officer stated that "the District continued to force the parent in front of a Magistrate. The message that might all too easily be absorbed is 'see what happens when you advocate vigorously for your Section 504 Plan.'" The record, however, shows no evidence that Fox Chapel "forced" Plaintiffs into

repeated truancy proceedings; in fact, the opposite is shown - - that the parties agreed to postpone the proceedings indefinitely, and the calendaring of these hearings was not the responsibility or request of Fox Chapel.

**V.     Conclusion**

Evidence does not support Plaintiffs' claims against Defendant, and no genuine issue of material fact exists.  Therefore, Defendant's Motion for Summary Judgment (Doc. No. 28) will be granted and Plaintiffs' Motion for Summary Judgment (Doc. No. 31) will be denied.

An appropriate Order follows.

<u>s/ Arthur J. Schwab</u>
Arthur J. Schwab
United States District Judge


cc:     All Registered ECF Counsel and Parties